## No. 2201

### Second Circuit

———

# HALL vs. EXCELSIOR STEAM LAUNDRY COMPANY, LTD.

———

(November 4, 1925. Remanded for New Trial.)
(June 30, 1926. Opinion and Decree.)
(Oct. 4, 1926. Rehearing Refused.)
(Nov. 29, 1926. Writs of Certiorari and Review denied by Supreme Court.)

———

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Appeal—Par. 745.**

Where the transcript and plat contained therein to which much of it refers is not sufficiently clear for one to understand the crucial effects of the case, it will be remanded for a new trial.

2. **Louisiana Digest—Automobiles—Par. 4, 4 (d).**

One who drives a truck to the left of a street turns a corner in violation

of a city traffic ordinance and the law of streets, although he saw another car, his driving is the proximate cause of the injury sustained by the collision.

3. **Louisiana Digest—Automobiles—Par. 8.**

An admission by a nervous woman directly after the accident that her brakes did not work will not be used against her recovery for damages if the weight of evidence shows that the brakes were in perfect working order and the skid mark on the pavement shows that they were used and took effect.

4. **Louisiana Digest—Damages—Par. 28, 29.**

Although the primary cause of a woman's insanity was climacteria, the change of life, nevertheless the exciting cause of this insanity was the shock she received in the accident. Consequently, those responsible for the accident are liable for the damage resulting.

5. **Louisiana Digest—Damages—Par. 105.**

Five thousand dollars considered sufficient quantum of damages for the results of an automobile accident which drove a woman permanently insane.

Appeal from the First Judicial District Court of Louisiana, Parish of Caddo. Hon. E. P. Mills, Judge.

Action by John T. Hall, administrator, etc., against Excelsior Steam Laundry Company, Ltd.

There was judgment for plaintiff and defendant appealed.

Judgment amended and affirmed.

Bullock & Warren, of Shreveport, attorneys for plaintiff, appellee.

Wilkinson, Lewis & Wilkinson, of Shreveport, attorneys for defendant, appellant.

CARVER, J. For the reasons given in the case of John T. Hall vs. Excelsior Steam Laundry Company, Limited, No. 2202 on the docket of this court and this day decided, it is decreed that the verdict of the jury and the judgment of the lower court thereon be set aside and the case remanded for a new trial.

———

ODOM, J. This suit grows out of an automobile collision which took place between an automobile driven by Mrs. Blanche E. Hall, the wife of John T. Hall, and defendant's laundry wagon, driven at the time by one of defendant's employees. The suit was brought by John T. Hall, husband of Mrs. Blanche E. Hall, acting as administrator pro tempore, it being claimed by plaintiff that Mrs. Hall was severely injured and shocked on account of the collision, which injury and shock finally resulted in her insanity.

Subsequent to the date on which the suit was filed Mrs. Hall died, and John T. Hall and a child by his marriage with Mrs. Hall were substituted as parties plaintiff, they having inherited Mrs. Hall's right of action.

The plaintiff alleged that the driver of defendant's laundry truck drove the truck into and against the automobile driven by Mrs. Hall, inflicting upon her serious injuries and which seriously frightened her, producing great physical pain and mental anguish, "impairing and shattering her nervous system, causing soon thereafter, as the direct and proximate result thereof, a habitual state of imbecility and insanity, which is incurable and permanent".

Defendant, in answer, admitted its corporate capacity and the alleged collision, but denied negligence on the part of its driver, and denied that plaintiff's wife

was injured as alleged; and, in an amended and supplemental answer it specifically set up that in case the court should find and hold that its driver was negligent, "then and in that event your defendant shows that Mrs. Blanche E. Hall, the driver of said automobile, was guilty of gross contributory negligence in that she drove her car with defective brakes and at a reckless rate of speed, without looking or listening or taking any precautions whatsoever", which contributory negligence is plead in bar of plaintiff's recovery.

The case was tried by a jury, which rendered a verdict in favor of plaintiff for $5000.00, which verdict was approved by the court and judgment rendered accordingly.

The defendant appealed, and plaintiff answered the appeal, asking that the amount be increased.

### OPINION

The collision took place at the intersection of Creswell street and Herndon avenue in the city of Shreveport. Creswell street runs north and south and is intersected by Herndon avenue at right angles. The Highland street car line, leading from the business section of the city, runs, in that particular vicinity, south along Creswell street until it reaches Herndon avenue, where it turns east and proceeds along that avenue.

Creswell street is thirty-six feet wide from curb to curb, both north and south of Herndon. Herndon avenue is thirty-six feet wide east of Creswell, but west of that street it is only twenty-eight feet wide. This is, therefore, what is termed an "irregular" intersection or crossing.

For some reason, probably to get more space for the street car line, the southwest corner of the block, northeast of the intersection, was cut off and the curb line built in a circle around that corner, so that a point at the intersection of a line drawn north and south on the east side of Creswell street and a line drawn east and west along the north edge of Herndon avenue is about eight feet out in the street from the curb.

The street car line has a double track on these streets, both tracks making a curve around the southwest corner of the block, northeast of the intersection. The inside rail of the inbound track coming out of Herndon avenue and into Creswell, runs within about three feet of the curb at the nearest corner. The inside rail of the outbound track runs within about twenty feet of the same point. The rails of the street car track are 4.75 feet apart, so that the outside rail of the outbound track is approximately twenty-five feet from the curb at the curve.

Mrs. Hall was driving her car west on Herndon avenue, and the laundry truck was being driven south on Creswell street. Mrs. Hall, it seems, was on the right-hand side of the avenue and intended, evidently, to cross Creswell street and proceed west on Herndon.

The laundry truck was on the west side of Creswell street, going south.

The two cars reached the intersection at the same time, and it is clear from the testimony that if the driver of the laundry truck had continued south on Creswell there would have been no collision; but when he got to the intersection he made a curve to the left in order to proceed east on Herndon. As he made the turn, the two cars collided, the left front

wheel and left end of the front bumper of Mrs. Hall's car striking the rear left side of the truck at or near the rear fender.

The witnesses say that the two cars "hung up" and had to be pulled apart. The impact caused the rear end of Mrs. Hall's car to swerve around to the right, so that when it stopped the body of the car was fronting towards the southwest and the front wheel turned towards the west.

There is some discrepancy in the testimony as to the exact point where the collision occurred. There were only three eye-witnesses to the collision—Mrs. Hall, who died previous to the trial, Mr. Chapman the driver of the truck, and Mr. Tucker, who was on the truck with him; but Doctor Harrington, Mr. Flournoy, and a young man named Bauguw, all of whom lived in that immediate vicinity, went to the scene at once, and each testified as to the position of the cars before they were moved.

From all the testimony, we conclude that the collision took place on the outbound car track at a point on a line drawn approximately northeast from the center of the intersection of the two streets—in other words, between the manhole which is at or very near the point where a line drawn north and south through the center of Creswell crosses a line drawn east and west through the center of Herndon and the southwest corner of the block, northeast of the intersection.

Using the plat filed in evidence, which is referred to by both parties as correct, we place the point of collision on the outbound car track approximately fifteen feet northeast of the manhole and something like twenty-three feet from the street curb at the northeast corner of the intersection.

As already stated, the driver of the truck was going south on Creswell and when he got to this corner he attempted to make a left turn into Herndon going east, following the outbound car track around the curve.

The negligence which plaintiff charges against defendant is that the truck driver "cut" the corner and ran too close to the curb, plaintiff claiming that in making the turn the driver of the truck should have gone further down Creswell and should have gone around the manhole in the center of the intersection and then turned to the east, as is required by ordinance of the city, in which event there would have been no collision. The ordinance of the city requires that drivers of vehicles on the streets in making left-hand turns at intersections shall go to the right of the center of intersection and shall pass them before turning to the left. It is contended that the failure to observe this regulation is negligence per se.

The defendant, while conceding that is true, contends that inasmuch as this was an "irregular" intersection, the ordinance does not apply and that it is neither practical nor necessary to observe the regulation at this particular intersection. Counsel for defendant contend that all that is necessary and all that is expected of a driver at this point in making the turn is to follow the outbound car track, which the driver of the truck did; and they point out that on account of the difference in the width of the two streets, Creswell being eight feet wider than that part of Herndon west of Creswell, the center of intersection of the two streets is much further from the northeast corner than it is from the southwest corner of the intersection.

According to the plat, which is drawn to scale, we find that it is approximately thirty-eight feet from the center of intersection to the curb on the northeast and only about twenty-five feet to the curb on the southwest corner.

Counsel argue that the ordinance was intended to apply only to regular intersections. Inasmuch as the ordinance makes no exceptions, we see no reason why the court should make any, especially in view of the fact that there is no showing and no suggestion that the provisions of the ordinance are unreasonable and could not be complied with to the letter at this particular crossing without danger and without inconvenience.

In order to go entirely around the center of intersection at this point the distance would be somewhat greater and the turn more precipitate, but it is not contended that the driver of the truck could not have complied with the provisions of the ordinance with all safety, and we cannot see that he would have suffered any inconvenience except in having to make a longer swing.

The city ordinance was adopted for the protection and safety of those who use the streets.

In Huddy on Automobiles, Sixth Edition, Section 388, it is stated:

"The course to be pursued around a corner is now generally prescribed by statute or municipal ordinance, and the requirements should be obeyed."

It is true, of course, that while the violation of a city traffic ordinance may be negligence per se, yet the negligence from such violation would not render the guilty party liable unless such negligence could be held to be the proximate cause of the injury.

Our conclusion from all the evidence in this case is that the driver of the truck was negligent and that his negligence was the proximate cause of the injury.

We do not, however, base our finding of negligence merely and solely upon the fact that the truck driver violated the city ordinance by failing to go around the center of the intersection. He violated the traffic ordinance of the city in another respect.

Section 35 of Ordinance 207 of the city of Shreveport, which is a general traffic ordinance, defines reckless driving and under Subsection (g) of Section 35 it is provided:

"Turning a street corner in a manner that endangers pedestrians, or property, failing to give notice of sufficient warning before making a turn."

Section 47 of the same traffic ordinance reads as follows:

"Be it further ordained, etc., that before a vehicle shall turn to the right or left the driver or occupant shall give a signal of his intention as above provided."

There is no question but that the driver of the truck violated the city traffic ordinance in these respects also.

But regardless of the ordinance, he was guilty of negligence in failing to observe the rules and practice ordinarily observed by drivers of vehicles on the street—he violated the "law of the street" as drivers understand it, regardless of any municipal ordinance. He not only failed to go around the center of intersection as the ordinance provides he should, but he made a short, sharp cut around the corner, running his car within twenty-three feet of the inside corner, notwithstanding he saw or could have seen, if he had looked, Mrs.

Hall's car coming down Herndon avenue on the right-hand side and near to the corner. He made the turn at or about the time she entered the intersection, without sounding any signal and without making any sign or motion whatever to indicate that he intended turning the corner.

The rules laid down in the city ordinance and observed generally by drivers of motor vehicles on approaching a street crossing in a populous city, if they intend to change their course, is to sound some signal or give some sign as a warning to other drivers of such intent. The sign used here and throughout the country is for the driver to hold out his left hand and arm when he intends to make a left-hand turn. This precaution is taken whether another car is approaching from the opposite direction or from the side, and even if no car is in sight, as one might be approaching from the rear. It is further understood that where no such sign or warning is given, the driver intends to keep straight ahead. This is the rule not only in the streets of cities but on public roads as well, frequented as they are by cars, and it is generally held that to make a left-hand turn around a corner or across a street without giving some signal is the grossest kind of negligence, and according to the specific provisions of the city ordinance it is reckless driving.

In the case of Brook vs. Interurban Motor Transportation Co., 156 La. 286, 104 South. 428, the question of the duty of drivers of cars when intending to alter their course was discussed. In that case a taxicab and a Cadillac car driven by Morefield collided. It was admitted by Morefield, the driver of the Cadillac, that when he reached the intersection of Beauregard and Sprague streets, in the city of Shreveport, he turned to the left to go north into Beauregard street. The court said:

"Morefield further says that his curtains were up, and that he gave no signal with his arm to indicate his intention to turn."

Morefield testified that he saw the taxicab but thought he had ample time to enter Beauregard street before the taxicab reached the intersection. The court went on to say:

"The proximate cause of the collision was the turning of the Cadillac crossways in the path which the taxicab was entitled to follow along Sprague street. Morefield was undoubtedly at fault in thus blocking the right of way of the taxicab. He gave no signals, and it matters not that the taxicab may have been exceeding the speed limit fixed by the city ordinances. The contributory negligence of the chauffeur of the taxi did not excuse Morefield's negligence. It is not only reasonable, but strongly dictated by ordinary common prudence, that a person driving an automobile **along a city street or any other much frequented highway, who wishes to alter his course, should exercise the greatest care and caution in so doing.**"

(Boldface type ours.)

The same rule is laid down in Huddy on Automobiles, Sixth Edition, Section 260.

In the case at bar, both the driver of the laundry truck and Mr. Tucker, who was on the seat with him at the time of the collision, testified as witnesses for defendant. Neither stated that any signal or warning was given of their intention to make the turn at the corner, and we assume that if any such had been given they would have said so. Nor do they suggest any reason why it was not done.

Defendant denies negligence solely upon the ground that the driver of the truck was complying with the spirit, if not the letter, of the ordinance. The facts are that he complied with neither. Nor did he observe the rule "strongly dictated by ordinary common prudence".

Seeing Mrs. Hall's car approaching the intersection and reaching there about the time he did, he should have given some signal of his intention to turn the corner. Not only that, he should have swerved as far away from the inside corner where she was as he could.

Again referring to the plat filed, we find that he could have swerved ten to fifteen feet further away from the corner and then would not have gone out as far as the center of intersection of the streets. Instead of driving out as far as he could, he came to within twenty-three feet of the corner, according to the testimony of the driver and the man who was riding with him, and to within less than that distance according to the testimony of some of the other witnesses.

We hold, therefore, that the driver of defendant's vehicle was grossly negligent and that his negligence was the proximate cause of the collision.

Defendant pleads contributory negligence on the part of Mrs. Hall:

"In that she drove her car with defective brakes and at a reckless rate of speed, without looking or listening or taking any precautions whatsoever."

The only testimony that the brakes on the Hall car were bad is that of Chapman and Tucker and possibly one other witness, who testified that Mrs. Hall said immediately after and at the scene of the accident that her brakes did not work.

The testimony of Mr. Hall, her husband, is that shortly after the collision he took the car to the Bernstein garage in order to have some repairs made and that the brakes worked perfectly and that they also worked perfectly thereafter. The mechanics who repaired the car found nothing wrong with the brakes.

There is testimony in the record that there were skid marks on the pavement made by the Hall car. That would indicate that Mrs. Hall applied the brakes and that they took effect.

According to all the witnesses, Mrs. Hall was greatly excited and nervous immediately following the collision, and if it be conceded that she made the statement attributed to her it does not necessarily follow that the brakes were in fact bad.

The witnesses state also that Mrs. Hall said that when she saw the collision was inevitable, she threw up her hands and quit. Considering the condition under which she made these statements, if she did, we attach but little importance to them.

The allegation that she was running at a fast and reckless rate of speed is disproven by defendant's witness, Tucker, who was on the laundry truck at the time, who testified that she was driving "very slowly but she had no brakes".

While such is not plead in answer, yet counsel for defendant suggest in oral argument and in brief that Mrs. Hall could have turned to the right and thereby have avoided the collision and that her failure to do so was contributory negligence barring recovery.

We do not think so.

Inasmuch as the driver of the truck sounded no signal and gave no sign of warning that he intended to change his course at the intersection, she had a right to assume that she intended to continue straight ahead down Creswell street. Furthermore, she had a right to assume that he would observe the provisions of the city ordinance and go further down the street before turning. If he had given any such

sign or had obeyed the city ordinance there would have been no collision. It was the truck driver's sudden turn at the corner which brought the rear left side of the truck into contact with the left front part of the Hall car. We do not find that she was negligent. She was on the right side of the street, driving slowly, and but for the sudden and unexpected turn of the truck no collision would have occurred.

From a physical standpoint, Mrs. Hall was not seriously injured in the accident. She had a bruise on the left shoulder and one on the hip; but otherwise she was uninjured physically.

However, the testimony all shows that she was greatly frightened and shocked, all of which threw her into a highly nervous state.

Defendant's other point is that the accident had no connection with and did not bring about Mrs. Hall's subsequent physical and mental decline, and ultimate insanity.

We cannot subscribe to that view.

Plaintiff called nine lay witnesses, each of whom knew Mrs. Hall intimately, some of them for a great many years. Each and every one of them testified that up to the date of the accident she was perfectly normal, physically and mentally. She was a member of the Presbyterian church and quite an active church worker. Five women were called and testified that they were her neighbors, saw her frequently and were intimately associated with her in church work. Judge W. P. Hall, a kinsman of her husband, had known her practically all her life. He and the other male lay witnesses saw and observed her frequently. Not one of these witnesses had ever observed in her any signs of physical decay or mental unbalance. Doctor Simmons had visited her professionally something like a year prior to the accident. He testified that she was somewhat nervous at that time but that she was undergoing her climacteric or change of life, and that her condition was normal for a woman undergoing that period. Her husband testified that all during the night following the day of the accident she could not sleep; that she repeatedly referred to and talked of the accident, and that she became so nervous that she could not bear the noise of water running into the bath tub or such noises as are made by crickets and katydids.

Physicians were called in who testified that they found her highly nervous and unstrung and suffering from insomnia, which condition they were unable to relieve. The physicians testified, as did all the lay witnesses, that a complete change came over her immediately after the accident. They all observed evidence of mental unbalance. Local physicians could do nothing to relieve her. She was finally sent to Touro Infirmary at New Orleans and placed under specialists who treated her for seven weeks. Being unable to relieve her, she was sent to the Louisiana Retreat, where she remained under treatment for more than five months. She finally became totally insane and was formally interdicted and sent to the Louisiana Hospital for Insane at Pineville, where she died.

Plaintiff called Dr. D. L. Kerlin, Dr. L. H. Pirkle, Dr. J. C. Thomas, Dr. J. C. Willis, Sr., Dr. T. E. Williams and Dr. J. D. Young, all of Shreveport, as expert witnesses to prove that her condition and final insanity was brought on by the accident.

The sum and substance of their testimony is that insanity may be and fre-

quently is brought on by trauma. That Mrs. Hall's suffering was what they called mental or psychic trauma, which sometimes follows a severe shock. They all testified that a woman undergoing the climacteric is more nervous and more susceptible to insanity than during any other period; but they were all of the opinion that a shock such as Mrs. Hall received may and frequently does bring on insanity. Their opinions may be summed up in the language of Dr. Kerlin who, on being asked his opinion as to the cause of the insanity in this case, said:

"The primary cause was climacteria, the change of life; the exciting cause was the shock she received in the accident."

Defendant called Dr. Ragan, a local physician, and took the testimony of Drs. Thomas and Keller of the Louisiana Hospital for Insane at Pineville, who attended her during her incarceration there. Each of these specialists testified that the accident could not and did not contribute in anywise to the patient's mental decay and final insanity.

We entertain the highest regard for the opinions of these eminent experts but we cannot accept their opinions in this case, in view of the opinions of the other experts in the same line to the contrary, and especially in view of the uncontradicted testimony that Mrs. Hall had been undergoing the change of life for about a year previous to the accident, during which time she had shown no sign of mental disorder, and without any explanation as to why she should have begun to show symptoms of insanity almost immediately following the shock.

Neither Dr. Ragan, Dr. Thomas nor Dr. Keller saw or attended Mrs. Hall immediately following the accident. Some of the other physicians did and observed her condition.

We have no doubt that the shock brought on the condition which resulted in the insanity.

## AS TO THE QUANTUM OF DAMAGES

Plaintiff can recover only such damages for pain and suffering as the deceased could have recovered had she lived. She was injured on or about February 3, 1922. She was finally interdicted and placed in the Hospital for the Insane on April 30, 1923, and died on June 12 following. For a period of more than sixteen months she suffered constantly and intensely. She was highly nervous, excitable and suffered from insomnia. Shortly after the accident she expressed a desire to die and contemplated suicide. She discussed with an intimate friend the easiest and best method of ending her existence. While at Pineville she escaped to Red River and jumped in in order to drown herself, but was rescued. Physically she became so emaciated that one of her intimate friends who viewed her remains at the parlor of the undertaker could not identify her.

The jury awarded damages in the sum of $5000.00. We think their findings on this point, as well as on all other points are amply supported by the evidence, and we shall not disturb them.

For the reasons assigned the verdict of the jury and the judgment of the court based thereon are affirmed with costs.

REYNOLDS, J., recused.